UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| U.S. AUTOMATIC SPRINKLER CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:07-cv-0944-SEB-TAB |
| vs. | ) | |
| | ) | |
| THE RELIABLE AUTOMATIC | ) | |
| SPRINKLER CO., FERGUSON FIRE & | ) | |
| FABRICATION, INC., f/k/a THE CLARK | ) | |
| GROUP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant The Reliable Automatic Sprinkler

Company's Motion for Summary Judgment [Docket No. 91], filed on May 1, 2009; and

Defendant Ferguson Fire & Fabrication, Inc.'s Motion for Summary Judgment [Docket

No. 93], filed on May 1, 2009.  Plaintiff U.S. Automatic Sprinkler Co. has brought this

cause of action against Defendants alleging breaches of the implied warranties of

merchantability and fitness for a particular purpose, in connection with leaks that

occurred in numerous fire protection systems Plaintiff installed at a project in

Greenwood, Indiana, in 2003.  For the reasons detailed in this entry, Defendants' motions

are <u>GRANTED</u>.[1]

---

[1] Both Reliable and Ferguson have included within their briefing motions to strike portions of the
affidavit of Bruce Agan.  Because we do not rely on the portions of the affidavit Defendants seek
to strike, Defendants' motions to strike are <u>DENIED</u> as moot.

*Factual Background*

**I.      *Leaks at The Quadrangle Project***

Plaintiff U.S. Automatic Sprinkler Co. ("U.S. Automatic") is a fire protection

contracting company.  Dep. of Agan at 14.  In 2003, U.S. Automatic designed and

installed a sprinkler system in a commercial warehouse in Greenwood, Indiana, known as

the Quadrangle Project.  In connection with this work, U.S. Automatic purchased

approximately 4,800 Model K-22 sprinkler heads from Defendant The Reliable

Automatic Sprinkler Company's ("Reliable").  Compl. ¶¶ 8, 18. U.S. Automatic also

purchased a similar number of welded female pipe fittings on prefabricated steel pipes

("weld-o-lets") from The Clark Group, Inc., corporate predecessor to Defendant Ferguson

Fire & Fabrication, Inc. f/k/a The Clark Group, Inc. ("Ferguson").[2] Compl. ¶ 24.  The

ordinary purpose of commercial sprinkler systems like those installed at the Quadrangle

Project, and the sprinkler heads and weld-o-lets used in such systems, is to provide fire

protection performance under water-pressurized conditions without leaks over an

extended period of time.  Dep. of Agan at 171; Beukema I at 137.[3]

U.S. Automatic installed these components at the Quadrangle Project using its

usual tools and techniques, which, over the course of many previous installations, had

_____

[2]The components delivered by The Clark Group (predecessor to Ferguson), which are sometimes referred to as "branch lines," are comprised of 2 ½ inch diameter pipe ranging in length up to 21 feet long to which several one-inch outlets, the "weld-o-lets," are welded.  Dep. of Agan at 158.

[3]Former Reliable Director of Engineering John Beukema was deposed twice in this litigation, first as Reliable's Federal Rule of Civil Procedure 30(b)(6) corporate representative ("Beukema I") and a second time when Reliable designated him as a testifying expert witness ("Beukema II").

never resulted in significant leaks or related problems.  Aff. of Agan ¶ 8.  During this

installation, however, some of U.S. Automatic's technicians reported to Bruce Agan,

President and majority shareholder of U.S. Automatic, that joining the sprinkler heads to

the weld-o-lets had resulted in irregular tightening.  Dep. of Agan at 149.  Reliable

typically requires its customers to use a wrench expressly designed for K-22 sprinklers,

but U.S. Automatic did not utilize such a wrench, nor did it measure the amount of torque

properly necessary to join these specific components.  Id. at 96, 102; Beukema II at 25.

U.S. Automatic completed installation of the sprinklers into the weld-o-lets in late

December of 2003.  Dep. of Agan at 105.  Upon finishing, U.S. Automatic began to test

the sprinkler systems (there were eleven in total) by filling each system with water and

bringing each to normal city water pressure, which process resulted in approximately 200

instances of leaking from the threaded connections between the sprinkler heads and weld-

o-lets.  Id.  These leaks prompted U.S. Automatic to shut the systems down, drain them,

and perform one of two remedial measures on each system: either removing the sprinkler

heads, cleaning the joints, and reinstalling the components or simply tightening the

sprinkler heads with an additional 180 degree turn.  Id. at 108.

Following these measures, U.S. Automatic began hydrostatic testing of the fire

protection systems by filling them with water and slowly increasing the water pressure

until it was greater than the standard operating pressure for the system.  Id. at 111.  By

early January 2004, all eleven systems at the Quadrangle project had successfully passed

this hydrostatic testing.  Id. at 114.  Two weeks later, however, additional leaks began to

develop, which U.S. Automatic attempted to fix by again applying the above measures. This cycle continued for several months, until it became obvious that these remedial steps would not yield a permanent solution.  Aff. of Agan ¶ 11.

At some point between January and March of 2004, Ross Maxwell of The Clark Group, Inc. (predecessor company of Ferguson, who provided the weld-o-lets to U.S. Automatic) recommended to Agan that he try sealing the joints with an anaerobic sealant. Dep. of Maxwell at 41; Dep. of Agan at 125, 126.  The use of such a sealant was not immediately chosen by U.S. Automatic as a remedial measure in part because it was considered an expensive, time consuming, and uncommon installation repair method. Aff. of Agan ¶ 12.  In March 2005, however, U.S. Automatic did apply this sealant to one of the eleven sprinkler systems, which succeeded in preventing further leaks.  Dep. of Agan at 122.  Four months later, at the request of the general contractor for the Quadrangle Project, U.S. Automatic applied this successful procedure to all the remaining ten systems.  Id.

## II.      *Investigations of the Leaks and Their Causes*

U.S. Automatic suspected throughout this process that the leaking had been caused by problems with the components provided by Reliable and Ferguson.  In an effort to investigate and pursue this theory, U.S. Automatic engaged Dr. George Langford, an experienced metallurgist, to determine what, in his expert opinion, caused the leakage in the sprinkler systems at the Quadrangle Project.  Aff. of Langford ¶¶ 4, 5.  Based on

measurements of what he viewed as the faulty components that had been installed at the project, Dr. Langford opined that the variability of the helix angle of the thread on the Reliable sprinkler heads was a contributing factor to the leaks.  Id. at ¶ 5.  He further concluded that, in certain instances, the Clark weld-o-lets were "out of round," or misshapen in such a way as to have also likely contributed to the leaks.  Id. at ¶ 8.

An analysis of the components was also conducted by Reliable when U.S. Automatic returned three allegedly faulty sprinkler heads to them soon after the first leaks developed.  Dep. of Agan at 132.  Reliable conducted three tests on the threads of these components, which included measuring those threads with a specialized gauge, subjecting them to pressure tests, and measuring the threads with an optical comparator.  Beukema II at 16, 74; Beukema I at 100.  According to John Beukema, who oversaw this testing in his role as Reliable's Director of Engineering in 2004, all three sprinkler heads passed these tests within standard tolerances.  Beukema I at 95; Beukema II at 18; Beukema I at 20.

Based on these tests, Beukema concluded that the Reliable sprinklers that had been installed at the Quadrangle Project would have formed a leak-tight seal if the proper sealant had been applied and if the female connection (here, the weld-o-let) was free from defect.  Beukema II at 135, 139.  Beukema also opined that numerous factors could have caused the leaks in this case, including deformities in the weld-o-lets, insufficient or improper sealant, or insufficient torque application during installation.  Beukema II at 68, 128-129.

## II.     *Ferguson Acquires Clark's Assets*

### A.     *Asset Sale*

On August 9, 2004, Ferguson entered into a written agreement to purchase certain assets of The Clark Group, Inc. ("Clark"), the company that provided the weld-o-lets installed by U.S. Automatic at the Quadrangle Project.  Dep. of Clark at 8, 10.  This sale was conditioned on the entry of a Confirmation Order by the bankruptcy court overseeing Clark's then ongoing bankruptcy proceedings, as discussed below.  That Confirmation Order specified that Ferguson purchased the Clark assets "free and clear" of all claims and that the transaction would not subject Ferguson to liability under "any laws affecting successor or transferee liability or fraudulent conveyance or transfer laws."  Dep. of Clark (Ex. 101).

In that asset sale, Ferguson purchased Clark's inventory, personal property, licenses, vehicles, and accounts receivable, but did not purchase Clark's trademarks, logos, computer software, or advertising literature.  Dep. of Clark (Ex. 101); Id. at 41, 50, 70-71.  Nor did Ferguson purchase any Clark corporate stock, cash, minute books, stock transfer books, corporate seals, records relating to liabilities, tax records, rights in non-purchased contracts, assets pertaining to fire alarm "Monitoring Business," insurance claims, or any actions or claims arising out of the Clark bankruptcy.  Dep. of Clark (Ex. 101).  None of the seven shareholders of the Clark entities received any Ferguson stock or stock options from this asset sale.  Moreover, none of the officers and directors of Clark become officers or directors of Ferguson as a result of the sale.  Dep. of Clark at 12-13,

42-43, 76.; Aff. of Clark ¶¶ 12, 13.

Ferguson assumed narrow liabilities in the asset sale, namely nine employment agreements, seven non-compete agreements, seventeen retention agreements, and liabilities arising after the closing date of the sale specifically relating to certain leases and licenses.  Dep. of Clark (Ex. 101).  Expressly excluded from Ferguson's assumed liabilities were those liabilities "arising out of or relating to a breach that occurred prior to the Closing Date" as well as "personal injury claims, claims for bodily injury or property damage, products liability claims, asbestos claims, environmental claims, breach of contract claims, employment claims, lender liability claims, or pre-petition secured or unsecured claims."  Id.

B.      *Clark Bankruptcy*

At the time Ferguson and Clark were negotiating and finalizing the sale of these Clark assets to Ferguson, Clark was undergoing Chapter 11 bankruptcy reorganization, which eventually led to its dissolution.  On October 2004, Clark filed a voluntary petition under Chapter 11 of the U.S. Bankruptcy Code in the Eastern District of Missouri.  The Plan of Reorganization filed by Clark in that action, which was approved by the bankruptcy court after a November 2004 hearing and made final by decree of that court in March 2006, provided that the sale of Clark's assets would be "free and clear" of "[a]ll debts . . . relating to, any acts of the Debtors" and all claims "of any kind or nature whatsoever that arise prior to the consummation of the Sale."  U.S. Automatic never filed

7

a bankruptcy claim against Clark.  Dep. of Agan at 189-190.  Clark did not officially

dissolve until August 29, 2006, nearly two years after it had finalized the sale of many of

its assets to Ferguson.

        This lawsuit was filed on July 19, 2007.

### *Legal Analysis*

## *I.  Standard of Review*

        Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material

fact exist, the court construes all facts in a light most favorable to the non-moving party

and draws all reasonable inferences in favor of the non-moving party.  See id. at 255.

However, neither the "mere existence of some alleged factual dispute between the

parties," id. at 247, nor the existence of "some metaphysical doubt as to the material

facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will

defeat a motion for summary judgment.  Michas v. Health Cost Controls of Ill., Inc., 209

F.3d 687, 692 (7th Cir. 2000).

        The moving party "bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enters., Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a party will be unable to satisfy the legal requirements necessary to establish its case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

## II. Reliable's Motion for Summary Judgment

Reliable moves for summary judgment on both of the breach of warranty claims U.S. Automatic asserts against it in the Complaint. According to Reliable, summary judgment is appropriate on the implied warranty of merchantability claim because U.S.

Automatic has failed to establish that the sprinkler heads were defective or that any
alleged defect was the proximate cause of U.S. Automatic's injuries.  With regard to the
claim for breach of the implied warranty of fitness for a particular purpose, Reliable
argues that summary judgment is warranted because the sprinkler heads were not used for
a particular purpose, no such purpose was communicated to Reliable, and U.S. Automatic
did not rely upon Reliable's skill or judgment in selecting the sprinkler heads.

A.  *Implied Warranty of Merchantability*

Unless excluded or modified, a warranty that goods shall be merchantable is
implied in all sales contracts in which the seller is a merchant with respect to goods of
that kind.  Ind. Code § 26-1-2-314(1); Frantz v. Cantrell, 711 N.E.2d 856, 859 (Ind. Ct.
App. 1999).  To be merchantable, goods must pass without objection in the trade under
the contract description; be of fair, average quality; and be fit for the ordinary purpose for
which such goods are used.  Ind. Code § 26-1-2-314(2); Royal Bus. Machs., Inc. v.
Lorraine Corp., 633 F.2d 34, 46 (7th Cir. 1980).  The goods "must 'conform to ordinary
standards, and . . . be of the same average grade, quality and value as similar goods sold
under similar circumstances.'"  Royal, 633 F.2d at 46 (quoting Jones v. Abriani, 350
N.E.2d 635, 645 (Ind. Ct. App. 1976)).

In order to prevail in a cause of action based on breach of warranty, the plaintiff
must provide "'evidence showing not only the existence of the warranty but that the
warranty was broken and that the breach of warranty was the proximate cause of the loss

10

sustained.'" Frantz, 711 N.E.2d at 860 (quoting Richards v. Goerg Boat & Motors, Inc.,
384 N.E.2d 1084 ,1090 (Ind. Ct. App. 1979)).  The plaintiff may not recover for breach of
an implied warranty where the evidence shows that there are several possible causes of
the plaintiff's injury, and for at least one of these possible causes the defendant is not
responsible, and it is just as reasonable and probable that the injury was the result of one
cause or the other.  Royal, 633 F.2d at 46 (quoting Republic Corp. v. Procedyne Corp.,
401 F. Supp. 1061, 1070 (S.D.N.Y. 1975)); see also Advantage Eng'g, Inc. v. Burks
Pumps, Inc., No. IP 92 442 C, 1994 WL 317126, at *10 (S.D. Ind. July 23, 1993) aff'd 28
F.3d 1216 (7th Cir. 1994) (unpublished table decision).

     According to Reliable, U.S. Automatic is unable to show that the sprinkler heads
were defective because the sprinkler heads complied with relevant industry standards.  In
addition, Reliable argues that U.S. Automatic is unable to establish causation because
there is more than one possible cause of the leaking, at least one of which is not related to
Reliable.  In support of its argument that there is more than one possible cause of the
leaking, Reliable points to the deposition testimony of John Beukema, Reliable's former
Director of Engineering.  After determining that the sprinkler heads complied with
industry standards, Beukema concluded that there were a number of potential causes of
the leaking, including defective weld-o-lets, insufficient use of sealant by the installer,
and insufficient use of torque by the installer when mating the sprinkler head with the
weld-o-let.  Beukema I at 68, 128-129.

While U.S. Automatic does not directly respond to this argument, it contends that Beukema's conclusion that the leaking was caused by installation errors is not supported by any evidence. Moreover, it argues that Dr. Langford's testimony establishes that the sprinkler heads were defective and thus a cause of the leak. However, even if we were to accept Dr. Langford's conclusion that the sprinkler heads were defective, his testimony fails to create a dispute as to whether other causes were just as reasonably probable to have caused the leaking. Specifically, Dr. Langford opined that sealant would prevent an excessively "bad" sprinkler head paired with an acceptable weld-o-let from leaking. Dep. of Langford at 168-173. Thus, Dr. Langford's testimony at most establishes that leaking occurs only when the weld-o-let is defective, regardless of whether the sprinkler head is defective. Because U.S. Automatic's attempts to refute Beukema's conclusions proved unavailing and because of the limited scope of Dr. Langford's testimony, it is clear that U.S. Automatic has failed to establish that Reliable's sprinkler heads, and not some other factor, caused the leaks.

Therefore, Reliable is entitled to summary judgment on U.S. Automatic's claim for breach of the implied warranty of merchantability because no reasonable fact finder could conclude that any defect in the sprinkler heads at the time of delivery was in fact the proximate cause of the leaking.

B. *Warranty of Fitness for a Particular Purpose*

An implied warranty of fitness for a particular purpose arises where the seller knows or has reason to know of a particular purpose for which the goods are required and the buyer relies on the seller's skill or judgment to select or furnish suitable goods.  Ind. Code § 26-1-2-315; <u>Royal</u>, 633 F.2d at 46.

U.S. Automatic has not identified the particular purpose for which the sprinkler heads were to be used, nor has it provided any evidence showing that Reliable was aware of any such purpose.  Moreover, U.S. Automatic admits that it selected the particular sprinkler head to be used in the Quadrangle Project without seeking any recommendations from Reliable, and there is no evidence before the Court that U.S. Automatic relied upon the representations of Reliable in determining whether the sprinkler head it selected was suitable for its intended purposes.  Thus, U.S. Automatic's claim for breach of the implied warranty of fitness for a particular purpose fails as a matter of law.

**III. *Ferguson's Motion for Summary Judgment***

Ferguson contends that summary judgment is warranted on four grounds: (1) U.S. Automatic's claims are barred by the discharge of all claims against Clark and by operation of the Confirmation Order and Final Decree in Clark's bankruptcy proceeding; (2) U.S. Automatic cannot establish that Ferguson is liable for the warranty claims under the law of successor liability; (3) U.S. Automatic cannot show that the weld-o-lets were

13

defective or that they were the cause of the leaks; and (4) U.S. Automatic's claim for the breach of the implied warranty of fitness for a particular purpose fails as a matter of law because U.S. Automatic did not use the weld-o-lets for a particular purpose, did not communicate any such purpose to Clark, and did not rely on Clark's judgment or skill in selecting the weld-o-lets. Because we find the second ground fully meritorious and dispositive, we do not address the other grounds advanced by Ferguson.

Under Indiana law, where one corporation purchases the assets of another, the buyer does not assume the liabilities of the seller. <u>Winkler v. V.G. Reed & Sons, Inc.</u>, 638 N.E.2d 1228, 1233 (Ind. 1994). Generally recognized exceptions to this rule include (1) an implied or express agreement to assume the obligation; (2) a fraudulent sale of assets done for the purpose of escaping liability; (3) a purchase that is a de facto consolidation or merger; or (4) instances where the purchaser is a mere continuation of the seller. <u>Id.</u> Ferguson asserts that none of these exceptions applies to the case at hand. Based on our review of each of these exceptions discussed in turn below, we hold that none of them applies here in a manner that would salvage U.S. Automatic's claims against Ferguson.


A. *Implied or Express Agreement to Assume Liability*

The purchaser of a corporation's assets may expressly or impliedly agree to assume certain liabilities of the seller. The Court may not find an implied agreement to assume the seller's liabilities where the contract provision negating liability is clear and

14

unambiguous.  See Travis v. Harris Corp., 565 F.2d 443, 446 (7th Cir. 1977).  The Asset

Purchase Agreement executed by Clark and Ferguson and approved by the bankruptcy

court expressly excludes assumption of "any liability arising out of or relating to a breach

that occurred prior to the Closing Date " as well as any liability relating to property

damage or breach of contract claims.  Clark Dep. Ex. 101 at 6.  Thus, we cannot conclude

that Ferguson expressly or impliedly agreed to assume the present liability.

      U.S. Automatic contends that, even if Ferguson did not expressly or impliedly

agree to assume liability for the present claims in the Asset Purchase Agreement, the

Court could find that Ferguson impliedly agreed to assume the liability for the warranty

claims when it sued U.S. Automatic in Hamilton County for failing to pay for the weld-o-

lets in full.  Specifically, U.S. Automatic contends that the complaint filed by Ferguson

"repeatedly treats Ferguson as the former Clark entity" by referring to Ferguson as the

seller of the goods, and, in doing so, Ferguson "made a legal admission that it is Clark."

See Br. in Supp. of Mot. for J. on the Pleadings Ex. A ¶¶ 2, 6-7, 9-20.

      This argument is unavailing, however, as a result of its failure to recognize the

difference between an agreement to accept the assets of the buyer, namely, its accounts

receivable, and an agreement to accept the liabilities of the buyer.  U.S. Automatic cites

no authority, nor have we encountered any, for the proposition that a buyer's attempts to

recover the seller's assets constitutes an agreement by the buyer to assume the seller's

liabilities.  Because the language in the Hamilton Court complaint is insufficient to raise

the inference that Ferguson agreed to assume liability for U.S. Automatic's warranty

claims, U.S. Automatic cannot establish successor liability under the first exception.

### B.  Fraudulent Sale of Assets

U.S. Automatic does not allege that Ferguson engaged in any fraudulent conduct in

completing the purchase of Clark's assets.  Moreover, a finding that no such fraudulent

sale occurred is supported by the Eastern District of Missouri Bankruptcy Court's

previous finding that Ferguson "acted in good faith" in undertaking the asset sale.

Accordingly, U.S. Automatic also cannot recover based on the second <u>Winkler</u> exception.

### C.  De Facto Consolidation or Merger

The Indiana Court of Appeals has set forth the following criteria for establishing a

de facto merger: (1) continuity of ownership; (2) continuity of management, personnel,

and physical operation; (3) cessation of ordinary business and dissolution of the

predecessor as soon as practically and legally possible; and (4) assumption by the

successor of the liabilities ordinarily necessary for the uninterrupted continuation of the

business of the predecessor.  <u>Sorenson v. Allied Products Corp.</u>, 706 N.E.2d 1097, 1100

(Ind. Ct. App. 1999).  A major factor supporting the finding of a de facto merger is a

transfer of stock as consideration.  <u>Travis v. Harris Corp.</u>, 565 F.2d 443, 447 (7th Cir.

1977) (finding no de facto merger where no stock was transferred).  "Where the assets are

sold for cash, no basic, fundamental change occurs in the relationship of the stockholders

16

to their respective corporations, and absent continuity of shareholder interest, the two corporations are strangers, both before and after the sale." Id. (citations omitted). "Absent a transfer of stock, the nature and consequences of a transaction are not those of a merger." Id.

In the present case, continuity of ownership is absent.  Ferguson purchased Clark's assets for approximately twenty million dollars in cash, Dep. of Clark (Ex. 101) at 6, and none of Clark's shareholders received stock in Ferguson as a result of the asset sale.  Aff. of Clark ¶ 12.  U.S. Automatic admits that continuity of ownership is lacking, but argues that continuity of ownership is less important in the present case because Ferguson is wholly owned by Ferguson Enterprises and no individual owns stock in Ferguson.  However, the fact that no individual owns stock in Ferguson does not mean that continuity of ownership is less important.  Rather, it lends support to the notion that Ferguson should not be held liable for the asserted warranty claims when its owners did not share ownership of Clark.  Thus, Ferguson's purchase of Clark's assets does not constitute a de facto merger between Clark and Ferguson, and the third exception does not apply in this case.

*D.  Mere Continuation*

The test for whether the purchaser is a mere continuation of the seller is not the continuation of the business operation, but rather the continuation of the corporate entity. Sorenson, 706 N.E.2d at 1100.  "An indication that the corporate entity has been

17

continued is a common identity of stock, directors, and stockholders and the existence of only one corporation at the completion of the transfer." Id. (citing Travis, 565 F.2d at 447).

Ferguson argues that U.S. Automatic is unable to establish that Ferguson is the mere continuation of Clark because none of Clark's shareholders received stock in Ferguson as a result of the asset sale, Aff. of Clark ¶ 12, and none of Clark's officers or directors became officers or directors of Ferguson. Aff. of Clark ¶ 13. In addition, it notes that Clark was not dissolved until August 29, 2006, nearly two years after the sale was closed on November 22, 2004. Clark Aff. ¶ 10. U.S. Automatic has failed to respond to this argument. Accordingly, Ferguson's purchase of Clark's assets does not qualify as a mere continuation of the seller's business because two corporations remained at the completion of the sale and there is no common identity of stock, directors, and stockholders. See Sorenson, 706 N.E.2d at 1100 (finding no mere continuation of the seller's business when the buyer did not retain any of the seller's directors, when the seller's shareholders never held any stock in the buyer, and when the seller never dissolved the corporation). As with the other exceptions to Winkler, this one also does not apply.

*E.  Expansion of the Common Law of Successor Liability*

Presumably acknowledging the weakness of its case under Winkler and the other controlling standards, U.S. Automatic argues that an expansion of the common law of

successor liability is warranted in the case at hand in order to enable U.S. Automatic to proceed against Ferguson. Specifically, U.S. Automatic argues that an exception is needed to vindicate the policies of federal bankruptcy law, or, alternatively, that the Court should adopt the so-called "product-line" exception.

Courts have expanded successor liability only in "certain limited contexts," such as personal injury or product defect cases and cases involving specific federal policies such as environmental and labor law. Glentel, Inc. v. Wireless Ventures, LLC, 362 F.Supp.2d 992, 1001, n. 20 (N.D. Ind. 2005). Indeed, courts like the Glentel Court have explicitly refused to expand successor liability law.

The Seventh Circuit has instructed that such an expansion should be implemented only "when the successor has had prior notice of the liability in question." Upholsterers' International Union Pension Fund v. Artistic Furniture of Pontiac, 920 F.2d 1323, 1327 (7th Cir. 1990). U.S. Automatic cites no evidence, nor alleges any facts, establishing that Ferguson had actual or circumstantial knowledge of U.S. Automatic's claim arising out of the leaks at the Quadrangle Project.[4] Thus, the case at bar does not present one of the limited contexts in which successor liability law should be expanded.

U.S. Automatic's reliance on the product-line exception to the law of successor liability is equally misplaced, given that this exception applies only when the claim is one for product liability involving personal injury. E.g., Guerrero v. Allison Engine

---

[4]Robert Clark, former president of The Clark Group, Inc., testified that, in negotiations over the asset purchase agreement, he had no discussions with Ferguson about the problems experienced at the Quadrangle Project. Dep. of Clark at 36-37. This cannot therefore form the evidentiary basis of circumstantial or actual knowledge on the part of Ferguson.

Company, 725 N.E.2d 479, 480, 482-83 (Ind.Ct.App. 2000).  The purpose of product

liability law is "to deter manufacturers from producing products that are unreasonably

dangerous to foreseeable users."  Id. at 482.  Here, the safety concerns embodied in this

policy are not implicated.  Furthermore, unlike persons injured by defective products, a

commercial buyer such as U.S. Automatic could have protected itself by negotiating more

favorable contract terms with Clark relating to quality of products, methods of inspection,

or remedies.  Therefore, the policy reasons for expanding successor liability in product

liability cases do not apply to the present commercial dispute.

Accordingly, U.S. Automatic has failed to raise a genuine issue of fact supporting

the expansion of successor liability in the present case, just as it has failed under each

other theory it has advanced to establish an appropriate legal link between Ferguson and

liability for the leaks that occurred at the Quadrangle Project.  Thus, summary judgment

in favor of Ferguson is warranted.


## IV.    Conclusion

For the reasons detailed in this entry, Reliable's Motion for Summary Judgment is

GRANTED, and Ferguson's Motion for Summary Judgment is GRANTED.  Final

judgment shall be entered accordingly.

IT IS SO ORDERED.

Date: _____06/11/2010_____

_Sarah Evans Barker_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Offer  Korin
KATZ & KORIN P.C.
okorin@katzkorin.com

Nicholas Ward Levi
KIGHTLINGER & GRAY
nlevi@k-glaw.com

John D. Meyer
GOODIN ORZESKE & BLACKWELL, P.C
jmeyer@goblaw.com

Donald G. Orzeske
GOODIN ORZESKE & BLACKWELL, P.C
dorzeske@goblaw.com

James William Roehrdanz
KIGHTLINGER & GRAY
jroehrdanz@k-glaw.com

Ronald George Sentman
KATZ & KORIN P.C.
rsentman@katzkorin.com